UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

SCOT GOLDMAN,

      Plaintiff,

     -against-

CAROLYN W. COLVIN, Acting
Commissioner, Social Security Administration,

      Defendant.

-----------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

13 Civ. 3291 (KMK)(JCM)

To the Honorable Kenneth M. Karas, United States District Judge:

  Plaintiff Scot Goldman ("Plaintiff") commenced this action pursuant to 42 U.S.C.

§ 405(g), challenging the decision of the Commissioner of Social Security ("the

Commissioner"), which denied Plaintiff's application for disability insurance benefits, finding

him not disabled.  Presently before this Court are:  (1) Plaintiff's motion to reverse the

Commissioner's decision and remand solely for the calculation of disability benefits or, in the

alternative, vacate such decision and remand for further consideration by the Commissioner,

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)") (Docket No. 11);

and (2) the Commissioner's cross-motion for judgment on the pleadings to affirm the

Commissioner's decision pursuant to Rule 12(c) (Docket No. 14).  For the reasons below, I

respectfully recommend that the Plaintiff's motion be granted in part and denied in part, that the

Commissioner's cross-motion be denied, and that the case be remanded for further proceedings.

## I. BACKGROUND

Plaintiff was born on March 9, 1964. (R.[1] 186).  He completed high school and two years of college. (R. 41).  Plaintiff suffered a traumatic brain injury in a motor vehicle accident when he was fourteen. (R. 417).  From 1992 to 2007, he worked as a warehouse worker. (R. 207).  He testified that he sustained a back injury in 1996, after which he continued to work at a desk job at the warehouse. (R. 55-56).  He left that position to become a clerk at Dunkin Donuts, where he continued to work until 2009. (R. 207).  Plaintiff completed a work history report on October 23, 2010, in which he indicated that at his position at Dunkin Donuts he was required to stand for eight hours each day, and to sit for thirty minutes. (R. 264-71).  He further reported that the heaviest weight that he lifted in this position was ten pounds. (R. 266).  At the hearing before the ALJ, Plaintiff stated that he left his position at Dunkin Donuts because he could not stand as required by the job. (R. 57).  Plaintiff claimed that he had not worked in any capacity since that time.[2] (R. 42).

On September 30, 2010, Plaintiff filed a disability insurance benefits application, alleging that he became disabled and was unable to work as of July 21, 2010 due to his impairments of epilepsy, depression, a brain injury, an eye injury, and a spinal injury. (R. 186, 206).  The Social Security Administration ("SSA") denied Plaintiff's application on February 22, 2011. (R. 140).  Plaintiff appealed the denial, and, on November 8, 2011, Plaintiff testified before Administrative Law Judge ("ALJ") Robert Gonzalez. (R. 37-103).  On January 27, 2012, ALJ Gonzalez affirmed the denial of benefits, concluding that Plaintiff was not disabled. (R. 7-

---

[1] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social security benefits, filed in this action on September 23, 2013. (Docket No. 7).

[2] The record contained evidence of $9,051 in earnings from 2010, following the conclusion of Plaintiff's employment with Dunkin Donuts.  (R. 42).  Plaintiff was unable to explain this income, but noted that the earnings might have been from a structured settlement that he continued to receive from the motor vehicle accident in 1979. (R. 43).

27).  The Appeals Council subsequently denied Plaintiff's request for review on March 18, 2013. (R. 1-5).  Thereafter, Plaintiff appealed the SSA's decision by filing the present action on May 15, 2013, (Docket No. 1), contending that the ALJ's decision was based on errors of law and was not supported by substantial evidence in the record.

**A.  Plaintiff's Medical Treatment History**

The administrative record contains medical records from treatment that Plaintiff has received for his epilepsy, depression, and spinal injury, as well as documentation of his eye injury.

**1.  Dr. Lancman and Other Seizure-Related Records**

The administrative record reflects that Plaintiff sought medical treatment for his seizure disorder symptoms from Dr. Marcelo Lancman at the Northeast Regional Epilepsy Group from July 2009 to November 2011.  (R. 417, 661).  On July 28, 2009, Plaintiff reported that he had suffered a severe head injury as a result of a car accident when he was fourteen years old, was in a coma for "a couple of days[,]" and had surgery at the time. (R. 417).  Beginning at the age of twenty five, he had very frequent generalized tonic-clonic seizures for approximately one year. (R. 417).  Following that period, he had smaller episodes of arm jerks and tremors, as well as episodes where he inappropriately touched himself. (R. 417).  His last generalized tonic-clonic seizure was approximately two years prior to this appointment, and he reported that they occurred approximately every two years. (R. 417).  He complained of significant memory problems, and fatigue following each episode. (R. 417).  He expressed unhappiness with his seizure control and sought an evaluation and follow-up care. (R. 417).  His current seizure medications at the time of this appointment were Depakote (1500 mg b.i.d.) and Tegretol (800 mg in the morning and 1000 mg at night).  (R. 417).

Dr. Lancman continued to see Plaintiff on a regular basis, with appointments on September 22, 2009, October 27, 2009, January 12, 2010, April 13, 2010, August 17, 2010, September 21, 2010, December 21, 2010, February 15, 2011, May 17, 2011, August 23, 2011, and September 20, 2011. (R. 420-25, 523, 574, 610-12). At most appointments, Plaintiff reported "no major seizures" but he continued to have "episode[s] of getting distracted for several seconds[,]" sometimes once or twice a week, and complained of memory difficulties. (R. 420-24, 523). Nonetheless, Plaintiff continually reported that he was experiencing no side effects from the medications and that he was "happy with seizure control." (R. 420-24, 523, 574). In September 2010, Dr. Lancman increased Plaintiff's dose of Depakote, (R. 425), and on September 28, 2011, Plaintiff was prescribed Keppra (250 mg twice a day) to add to his existing seizure medication, (R. 654). Otherwise, Plaintiff's medicinal regime remained constant during this period. Dr. Lancman informed Plaintiff on October 5, 2010 that his seizures were "unpredictable and [could] occur at anytime." (R. 497). He instructed Plaintiff to "maintain seizure precautions at all times[,]" noting that such precautions included "no climbing or heights, no swimming without close supervision, avoiding extreme temperature changes and all heat sources, avoid[ing] exhaustion, . . . not operat[ing] heavy machinery, no overhead lifting, and avoiding situations where loss of consciousness may endanger [Plaintiff] or others." (R. 497). Because Plaintiff had not been seizure free for one year, Dr. Lancman reminded him that he was not permitted to operate a motor vehicle in the state of New York. (R. 497).

In addition to these office visits, Plaintiff was monitored by a video-EEG on four occasions. Dr. Lancman and his associate Dr. Christos Lambrakis conducted a three-day video EEG monitoring from August 10 to August 12, 2009, in which no clinical seizure events were recorded. (R. 387-98). Nonetheless, Dr. Lancman and Dr. Lambrakis noted that the results were

abnormal due to the presence of occasional spike discharges noted to rise over the central and anterior temporal region of the left hemisphere, which suggested some degree of epileptogenic potential over that region. (R. 391).

Plaintiff was admitted for video-EEG monitoring once again from August 23 to August 26, 2010, because Plaintiff continued to suffer from the "episodes of zoning out and it [wa]s not clear whether they [were] seizures [or] not." (R. 424).  Again there were no recorded seizure events during this monitoring. (R. 429-31).  Dr. Lambrakis noted the presence of occasional spike discharges emanating over the frontotemporal region of the left hemisphere, which suggested some degree of epileptogenic potential over this region, and focal slowing over the frontocentral region of the left hemisphere, which suggested some degree of cerebral dysfunction over this region. (R. 431).

An ambulatory video-EEG was performed from January 31 to February 3, 2011, in an attempt to capture these "very frequent episodes that are unclear [in] nature." (R. 523).  During this monitoring Plaintiff pressed a button on the digital device to indicate that he was having an episode. (R. 617-19). The results of the EEG were normal, and there were no EEG changes associated with the button press. (R. 620).

Finally, Plaintiff was monitored by video-EEG from September 26 to September 28, 2011, but again there were no recorded seizure events.  (R. 650-52).  Dr. Lambrakis noted the presence of occasional spike discharges over the frontal, central and temporal regions of the left hemisphere, indicating some degree of epileptogenic potential over these regions, and the presence of higher amplitude more sharply contoured rhythm over the frontal region of the left hemisphere, which was suggestive of a breach rhythm and was consistent with Plaintiff's previous history of craniotomy over this region. (R. 650-52).  Dr. Lambrakis concluded that "as

no seizure events were recorded during the course of monitoring, it is difficult to conclude the character of the patient's episodes" but recognized that Plaintiff's description of the recent "episodes" could "certainly represent partial seizure phenomenon." (R. 654).

Dr. Lancman also referred Plaintiff to Dr. Gonzalo Vazquez-Casals, a clinical neuropsychologist, for neuropsychological testing for comprehensive evaluation of his seizure disorder. (R. 514-20). Dr. Vazquez-Casals reported that Plaintiff's test results indicated average intellectual functioning and variability, including impairments in his academic, attention, language, memory, visuospatial, fine motor and executive skills, which were consistent with Plaintiff's history of a traumatic brain injury and epilepsy. (R. 519). Dr. Vazquez-Casals also noted Plaintiff's difficulties in aspects of concentration and sustained visual attention, repetition, verbal learning/recall/recognition, visuomotor integration, and weakness in executive functions, which were consistent with Plaintiff's abnormal electroclinical activity in the left frontotemporal regions of his brain. (R. 519).

In addition to his treatment from Dr. Lancman, Plaintiff sought medical treatment from St. Luke's Cornwall Hospital Emergency Room physicians on August 3, 2011, reporting that he had had a seizure. (R. 634). He and his wife recounted the emergency room visit to Dr. Lancman at his next visit on August 23, 2011, explaining that he had a grand mal seizure and was discharged from the emergency room on an increased dose of medication. (R. 611). This was Plaintiff's only grand mal seizure during this two year period.

Dr. Lancman completed a Residual Functional Capacity ("RFC") assessment of Plaintiff on October 25, 2011. (R. 621-24). Dr. Lancman reported that Plaintiff had approximately two seizures per month, with loss of consciousness. (R. 621). Dr. Lancman estimated that Plaintiff would need to take two unscheduled breaks during an eight-hour working day, and that his

-6-

seizure disorder would cause him to be absent from work about two to three days per month. (R. 624). In terms of specific limitations, Dr. Lancman noted that plaintiff must avoid heights, temperature extremes, fumes, gases, climbing, swimming, heat sources, and lifting over his head. (R. 624).

## 2. Dr. Schild

Plaintiff began seeing Dr. Linden Schild, M.D. on August 13, 2010 for a mental health evaluation. (R. 413). Dr. Schild noted Plaintiff's history of a traumatic brain injury, and his complaints of feeling confused, low attention, difficulty conveying his thoughts, distractability, low energy, depression, dysphoric affect, and an inability to complete tasks or "take charge." (R. 413-14). Dr. Schild diagnosed Plaintiff with a mood disorder, atypical ADHD, an anxiety disorder, and deferred traumatic brain injury. (R. 415). He renewed Plaintiff's prescription for Prozac, previously prescribed by Plaintiff's primary care physician, and prescribed Strattera for Plaintiff's ADHD symptoms. (R. 415).

The record reflects that Plaintiff continued to see Dr. Schild on an approximately monthly basis from October 2010 to July 2011. (R. 488, 593-96). At most appointments, Plaintiff reported feeling "ok," although he occasionally complained of fatigue and difficulty sleeping. (R. 593-96). Dr. Schild added Sonata for sleeping difficulty, continued to prescribe Prozac, and prescribed Tenex for Plaintiff's ADHD symptoms when Plaintiff reported not being able to tolerate the Strattera. (R. 488, 594). On July 25, 2011, Plaintiff reported feeling "bored," after stating "I don't do anything." (R. 596).

On March 22, 2011, upon learning that Plaintiff had been denied social security benefits, Dr. Schild expressed his surprise at the determination that Plaintiff was not disabled, writing "the patient IS disabled, in my professional opinion. [Patient] is impulsive [and] has impaired stress

tolerance.  These symptoms impair his ability to carry out tasks, and his ability to interact with peers, supervisors, or the public, in a work setting." (R. 595) (emphasis in original).  Dr. Schild reiterated these conclusions in his mental impairment assessment provided on November 7, 2011. (R. 655-60).

### 3.  Dr. Dunkelman and Other Orthopedic Records

The administrative record contains handwritten notes from Dr. Neal Dunkelman, Plaintiff's pain management specialist for his spinal injury, beginning November 11, 2008 and continuing until August 18, 2011, however the majority of these notes are entirely illegible. (R. 433-70, 597-608).  The few records from Dr. Dunkelman's care that are legible predate Plaintiff's alleged date of disability onset. On November 17, 2009, Dr. Dunkelman wrote a letter to the New York State Office of Temporary and Disability Assistance reporting that Plaintiff had "chronic back problems, which [did] affect his ability to sit, lift, carry, stand, walk, push and pull." (R. 447).  Dr. Dunkelman attached a report from an MRI study of Plaintiff's back dated October 6, 2009, which showed evidence of an old mild compression fracture of Plaintiff's T11 vertebral body and broad based central disc herniation at L4-L5 with mild ventral thecal sac compression. (R. 446).  Multiple records from 2009 indicated that Plaintiff was only able to walk and/or stand for thirty minutes to one hour, before his back spasms set in. (R. 465, 476).  Dr. Dunkelman prescribed Percocet and physical therapy, including pool therapy. (R. 470).

Following the date of onset, Dr. Dunkelman's records indicate that Plaintiff continued to see Dr. Dunkelman every month from July 2010 to August 2011, but otherwise the records provide little to no guidance as to Plaintiff's progress as only the date of each appointment is legible. It appears that Plaintiff reported that his pain ranged between five and nine out of ten, and the word Percocet can be read on a few records. (R. 433, 436, 438, 598-601, 603).

Otherwise it is impossible to determine what symptoms Plaintiff reported to this treating physician or what Dr. Dunkelman's impression was of Plaintiff's spinal injury.

Plaintiff sought a second opinion regarding his spinal injury from orthopedic surgeon G. Bhanusali on December 30, 2010. (R. 525-26). Dr. Bhanusali's examination revealed tenderness in the thoracolumbar spine area, limited and painful range of motion of the thoracolumbar spine, no renal angle tenderness, and bilateral straight leg raising to sixty degrees at the knee and ankle. (R. 526). An X-ray of the thoracolumbar spine revealed status post healed compression fracture at T11 vertebra and some degenerative changes. (R. 526). Dr. Bhanusali advised Plaintiff to discuss an epidural steroid injection for the lower lumbar spine with his pain management doctor, and to continue to follow up with Dr. Dunkelman regarding physical therapy. (R. 526). Dr. Bhanusali did not provide an opinion as to Plaintiff's limitations for sitting, standing, or lifting.

**4. Other Medical Records**

The administrative record also contains evidence of Plaintiff's eye injury in the form of a report from Jules Vision Center, signed by Optometrist Paul Collins. (R. 502-08). The report notes that Plaintiff had no vision in his right eye with no chance of recovery due to the visible atrophy of his optic nerve and his loss of direct pupillary response. (R. 507).

**B. Consulting Physicians**

The administrative record contains evaluations by three consulting physicians.

**1. Dr. Leena Philip**

Dr. Philip examined Plaintiff in January 2011. (R. 540-44). Dr. Philip noted Plaintiff's medical history and pain complaints. (R. 540). She found Plaintiff had no acute distress and no trouble changing for the exam or getting on or off the examination table. (R. 541). Plaintiff had

a normal gait but needed to hold onto the chair for support while squatting. (R. 541). His lumbar spine showed decreased flexion to sixty degrees, but he had full range of motion in his hips, knees, and ankles bilaterally. (R. 542). An X-ray showed mild levoscoliosis of his lumbar spine. (R. 543). Dr. Philip diagnosed Plaintiff with a seizure disorder, traumatic brain injury, and depression by history, and back pain with history of fracture of T11 vertebrae. (R. 543). Dr. Philip opined that Plaintiff should avoid driving and operating machinery due to his seizure disorder. (R. 543). Dr. Philip also concluded that Plaintiff had mild limitations for repetitive bending, heavy lifting, and carrying due to back pain. (R. 543).

## 2. Dr. Daniel Mangold

Dr. Mangold, a state agency review psychiatrist, provided a Mental RFC Assessment and Psychiatric Review of Plaintiff's medical records in January and February of 2011. (R. 549-566). Dr. Mangold found only moderate limitations in the Plaintiff's understanding and memory, sustained concentration and persistence, social interaction, and adaption. (R. 549-50). Dr. Mangold concluded that Plaintiff appeared to retain the mental ability to perform simple competitive work in a low contact work setting. (R. 565).

## 3. Dr. A. Auerbach

Dr. Auerbach, a state agency review analyst, provided a review of Plaintiff's medical records in December 2010 and February 2011. (R. 510-11, 567-68). Initially Dr. Auerbach concluded that Plaintiff should observe seizure precautions and avoid tasks requiring binocular vision and depth perception, but stated that he was not able to make a finding regarding Plaintiff's limitations relating to his spinal injury without a detailed orthopedic exam. (R. 510). In February 2011, Dr. Auerbach described Dr. Bhanusali's findings and concluded that "[b]ased on the available orthopedic medical evidence, the claimant should be capable of lifting 20 [lbs]

occ[asionally], 10 [lbs] freq[uently], stand/walk 6/8, and sit 6/8 hours." (R. 567).  There is no indication that Dr. Auerbach was able to review the treating physician Dr. Dunkelman's records.

### C.  Plaintiff's Testimony during November 8, 2011 Hearing before ALJ Gonzalez

At the November 8, 2011 hearing, ALJ Gonzalez inquired into Plaintiff's household, and Plaintiff said that he lived with his wife, who is wheelchair-bound as a result of spinal stenosis and a bad knee, and other family members. (R. 52-53). When asked about his back, Plaintiff explained that he broke his eleventh vertebrae in 1996, and following that injury was given a desk job at the warehouse where he was employed. (R. 55-56).  ALJ Gonzalez questioned Plaintiff about his most recent employment at Dunkin Donuts.  Plaintiff responded that the heaviest thing he had to lift in the position was a cup of coffee, but that he was never given a chance to sit down while he was working, and instead had to stand the whole time. (R. 57).  He reported that he left the job because he "couldn't stand anymore" and said that the owner "keeps asking [him] to come back to work." (R. 57).

Regarding his seizures, Plaintiff testified that he had seizures two to four times a week, lasting between four and ten minutes. (R. 59-60).  Plaintiff reported that during these episodes he had tremors, was fully conscious, but couldn't "function."  (R. 59-60).  In addition to those seizure episodes, Plaintiff testified that he had grand mal seizures less frequently, but that the last one was in August, when he went to the hospital. (R. 59).  He reported that he was currently on Depakote and Tegretol for seizure control, and that he experienced exhaustion as a side effect of the medication. (R. 47-48).

When asked about his spinal injury, Plaintiff testified that Dr. Dunkelman was weaning him off of the Percocet and that he had been doing pool therapy for his back. (R. 68).  He reported that the pool therapy was "fantastic" but that he "felt better when [he] was using the

Percocet and the pool therapy" and the pool therapy alone was "eh." (R. 69). He clarified that the pain in his lower back was "always there" and classified his pain as an eight out of ten, with additional pain radiating down the backs of his legs. (R. 69). He testified that the heaviest thing that he could lift was a gallon of milk with two hands, and that the longest he could stand without interruption was twenty minutes, walk without interruption was twenty minutes, and sit without interruption was fifteen to twenty minutes. (R. 75-76).

Plaintiff also testified about his mental health, stating that he saw Dr. Schild once a month, was on Prozac and a sleeping medication, but that he had "very good" relationships with his family members and had one friend who lived down the street from him with whom he worked on cars on the weekends. (R. 62-64).

On the subject of his daily activities, Plaintiff stated that he played PlayStation for ten hours a day until about two months prior to the hearing, when his daughter took the system away from him following a seizure. (R. 46, 78). He reported that he regularly went shopping with his daughter, but that he used an electric scooter at the store because of his knee and back pain. (R. 54-55). He told ALJ Gonzalez that he and his wife went on a cruise in the Caribbean a year and a half prior to the hearing for nine days, without any other family members. (R. 77-78). Plaintiff also testified that he went fishing about once a month in the summer. (R. 66-67). When asked by his attorney, Plaintiff clarified that when he helped his friend to fix cars on the weekends, he mostly handed him tools, while his friend did the work, but he also said that he could put together an exhaust manifold, put headers on, and give a car a tune-up and an oil change. (R. 90-91). He explained that he could not do this as a job, however, because he could not stand or sit for an eight-hour period. (R. 92). He clarified that while at home watching television, he would get up and walk around between half-hour programs. (R. 92). He stated that his back hurt at the

time of the hearing, although ALJ Gonzalez remarked that Plaintiff looked "pretty comfortable sitting there." (R. 93).

## II. THE ALJ'S DECISION

The ALJ applied the five-step approach in his January 27, 2012 decision. (R. 10-20). At the first step, the ALJ found that Plaintiff was not engaged in "substantial gainful activity since July 21, 2010, the alleged onset date." (R. 12). At the second step, the ALJ determined that Plaintiff had the following severe impairments: epilepsy, traumatic brain injury, right eye blindness, status post thoracic spinal fracture and disc herniation, and depression. (R. 12). At the third step, the ALJ held that Plaintiff did not have a medically determinable impairment or a combination of impairments that were listed in "20 C.F.R. Part 404, Subpart P, Appendix 1." (R. 13).

The ALJ then determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), with the further limitation that he could perform simple unskilled work for which he was familiar, and he could not perform work that required significant depth perception, unprotected heights, dangerous machinery, or jobs that required driving a motor vehicle. (R. 14). He also found that Plaintiff could not perform work requiring highly aerobic activities. (R. 14). ALJ Gonzalez noted that Plaintiff could "sit for up to 8 hours, stand and or walk up to 6 hours, and can lift and carry at least 5 lbs." (R. 14).

In determining Plaintiff's RFC, the ALJ held that Plaintiff's medically determinable impairments could reasonably cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the RFC determination. (R. 19). The ALJ discussed Plaintiff's engaging and friendly demeanor during the hearing, and his "candid testimony"

regarding caring for his disabled wife who was wheelchair-bound during a nine-day cruise, playing PlayStation up to ten hours a day until August 2011, changing oil and putting together gaskets for cars, fishing, and his good relationships with his family members. (R. 15). The ALJ also stated that although Plaintiff claimed to be able to sit for only twenty minutes, "he sat for over an hour during the course of the hearing proceedings and appeared to be in no apparent distress." (R. 16).

The ALJ specifically noted his "careful consideration of the entire record." (R. 14). He said that he gave "little weight" to Dr. Schild's assessment that Plaintiff could not get along with others or carry out simple tasks because Plaintiff's "own testimony indicated the claimant gets along with others, has friends, goes shopping, has good family relationships and engages in hobbies such as restoring automobiles." (R. 17). Additionally, the ALJ found that Dr. Schild's assessments were "inconsistent with the objective evidence contained in the record and unsupported by Dr. Shild's [sic] own treatment notes of the claimant." (R. 17). Regarding Dr. Lancman's report, the ALJ stated that he gave limited weight to Dr. Lancman's assessment that plaintiff would miss work three times per month and would need unscheduled breaks because of his seizures. (R. 18). The ALJ justified this conclusion by noting that Dr. Lancman's reports indicated that Plaintiff had extended periods of being seizure free and that he had reported no side effects from the medications, instead stating that he was happy with his seizure control. (R. 18). ALJ Gonzalez gave some weight to Dr. Lancman's assessment that Plaintiff must maintain seizure precautions at all times, given that it was supported by recent EEG testing. (R. 18). Most notably, ALJ Gonzalez did not mention any of the medical records from Dr. Dunkelman in his decision.

-14-

At the fourth step, the ALJ determined that Plaintiff was capable of performing his past relevant work as a clerk in a doughnut store, noting that Plaintiff was not required to lift or carry anything heavier than a cup of coffee in that position. (R. 20).  As a result, the ALJ concluded that Plaintiff retained the capacity to do this past work, and therefore that he was not disabled. (R. 20).

## III. DISCUSSION

Plaintiff argues that the ALJ's decision is erroneous as a matter of law and is not supported by substantial evidence.  Specifically, Plaintiff maintains that the ALJ erred in his determination of Plaintiff's RFC by: (1) not properly applying the treating physician rule; (2) improperly discounting Plaintiff's subjective pain complaints without considering the correct factors; (3) failing to perform a function-by-function assessment; and (4) improperly concluding that Plaintiff's statements were not credible to the extent that they were inconsistent with the ALJ's RFC determination. (Docket Nos. 12, 16).  Additionally, Plaintiff maintains that the ALJ's determination at step four that Plaintiff was capable of performing his past relevant work as a clerk at a doughnut shop is not supported by substantial evidence, and that the ALJ erred in not fully developing the record regarding the requirements of that position. (Docket Nos. 12, 16).

### A.  Legal Standards

A claimant is disabled and entitled to disability benefits if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "'and bears the burden of proving his or her case at steps one through four.'" *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (citation omitted).

**B. Standard of Review**

When reviewing an appeal from a denial of Social Security benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g). The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quotation marks and citations omitted). If the findings of the Commissioner are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971).  The substantial evidence standard "is still a very deferential standard of review—even more so than the 'clearly erroneous' standard.  The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (emphasis in the original) (quotation marks and citations omitted).  "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149 (citation omitted).  Even if there is evidence on the other side, the Court defers "to the Commissioner's resolution of conflicting evidence." *Cage*, 692 F.3d at 122 (citation omitted).

Additionally, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.  Failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quotation marks and citation omitted).

The ALJ also has an affirmative obligation to develop the record due to the nonadversarial nature of the administrative proceeding. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citations omitted).  However, if "there are no obvious gaps in the administrative record, and the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information. *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quoting *Perez,* 77 F.3d at 47).

## C.  The Treating Physician Rule

At step four in the disability analysis, the ALJ must first determine the applicant's RFC. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  In determining an applicant's RFC, the ALJ must apply the treating physician rule, which requires the ALJ to afford controlling weight

-17-

to the applicant's treating physician's opinion "when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2).  Thus, "'[a] treating physician's statement that the claimant is disabled cannot itself be determinative.'" *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir. 2003)).  Moreover, if there is substantial evidence in the record that contradicts or questions the credibility of a treating physician's assessment, the ALJ may give that treating physician's opinion less deference. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (refusing to give controlling weight to treating physicians' opinions, as they were not supported by substantial evidence in the record); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (same); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (same).

To discount the opinion of a treating physician, the ALJ must consider various factors and provide a "good reason." 20 C.F.R. § 404.1527(c)(2)-(6).  These factors include:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency with the record as a whole; (5) the specialization of the treating physician; and (6) other factors that are brought to the attention of the Court. *See Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

The Second Circuit has made clear that the ALJ need not "slavish[ly] recit[e] . . . each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013); *see also Molina v. Colvin*, No. 13 Civ. 4701(GBD)(GWG), 2014 WL 2573638, at *11 (S.D.N.Y. May 14, 2014) (collecting cases). What is required, however, is that the ALJ provide "good reasons" when not affording

controlling weight to a treating physician's opinion. *Selian*, 708 F.3d at 419 (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); 20 C.F.R. § 404.1527(c)(2)); *see also Petrie*, 412 F. App'x at 407 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)) ("[W]here 'the evidence of record permits [the Court] to glean the rationale of an ALJ's decision, [the Court] do[es] not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'").

Plaintiff argues that the ALJ improperly applied the treating physician rule with respect to his three treating physicians.  I will address each physician in turn.

## 1. Dr. Schild

Plaintiff contends that the ALJ erred in not giving controlling weight to Dr. Schild's assessment in his mental impairment RFC statement dated November 7, 2011.  This argument is unpersuasive.  Dr. Schild concluded that Plaintiff was "totally and permanently psychiatrically disabled[,]" and that his symptoms "impair[ed] his ability to perform and complete tasks, or interact with others." (R. 655).  ALJ Gonzalez made clear that he accorded little weight to this assessment because it was inconsistent with objective evidence contained in the record, unsupported by Dr. Schild's own treatment notes from August 2010 through July 2011, and contrary to Plaintiff's testimony at the hearing that he gets along with others, has friends, goes shopping, has good family relationships, and engages in hobbies. (R. 17).  These are adequate reasons for discounting Dr. Schild's assessment.  Dr. Schild's treatment notes do not support the conclusion contained in Dr. Schild's mental impairment RFC statement.  Instead, these notes indicate that Plaintiff was "doing okay" despite experiencing symptoms of depression and fatigue. (R. 594, 596).  Additionally, Plaintiff's hearing testimony regarding his interpersonal

relationships with friends, family, and his former boss, coupled with Plaintiff's medical records, constituted substantial evidence contradicting Dr. Schild's conclusion. The ALJ did not err by not giving Dr. Schild's assessment controlling weight.

## 2. Dr. Lancman

Plaintiff argues that ALJ Gonzalez substituted his own judgment for that of Dr. Lancman when he chose to give limited weight to the treating neurologist's conclusions. The ALJ gave weight to Dr. Lancman's conclusion that Plaintiff must maintain seizure precautions at all times, and that conclusion is reflected in the RFC. However, ALJ Gonzalez noted that neither Dr. Lancman's treatment notes nor the objective medical evidence in the record support the conclusion that Plaintiff would miss work three times per month due to his seizure condition. To the contrary, Plaintiff's video-EEG records from 2010 and 2011 were not able to confirm that the episodes that he experienced on a regular basis were in fact seizures. The ALJ also noted that Plaintiff reported being happy with his seizure control at his appointments with Dr. Lancman in 2011, despite the continued presence of these episodes. In assessing these contradictions and determining that this particular conclusion of Dr. Lancman was not support by his treatment notes, ALJ Gonzalez did not substitute his own judgment for that of Dr. Lancman, nor did he improperly apply the treating physician rule.

## 3. Dr. Dunkelman

Finally, Plaintiff maintains that the ALJ erred by not considering the treatment records of Dr. Dunkelman, Plaintiff's pain management specialist. This contention has merit. The record reflects that Dr. Dunkelman treated Plaintiff for pain management relating to his spinal injury from November 2008 through August 2011. (R. 433-70, 597-608). Legible records from prior to the alleged date of onset note that Plaintiff had an old mild compression fracture of the T-11

vertebral body, broad based central disc herniation at L4-L5 and mild ventral thecal sac compression. (R. 446). Prior to the alleged date of onset, Dr. Dunkelman opined that Plaintiff had chronic back problems that affected his ability to sit, lift, carry, stand, walk, push, and pull. (R. 447). Other records from 2009 note that plaintiff was able to walk/stand for thirty minutes to one hour, before spasms set in. (R. 465, 476). The ALJ made no mention of these pre-2010 records in his decision, nor does it appear that he considered Dr. Dunkelman's records from after the alleged date of onset. This is likely because Dr. Dunkelman's handwritten notes are largely illegible. On close review, the Court was able to make out mentions of Percocet, the pain medication that Dr. Dunkelman prescribed to Plaintiff, and fractions that varied from 5/10 to 9/10, presumably noting Plaintiff's pain level at each appointment. Otherwise these handwritten notes are not decipherable.

It is clear that Dr. Dunkelman was Plaintiff's treating physician for pain relating to his spinal injury, and his opinion was therefore entitled to controlling weight provided that the ALJ did not have "good reasons" to discount it. ALJ Gonzalez provided no reason for discounting Dr. Dunkelman's opinion; in fact, he made no mention of either the legible records from 2009, or the illegible records from after the alleged date of onset. This is an appropriate ground for remand. *See Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975) ("Where medical records are crucial to the plaintiff's claim, illegibility of important evidentiary material has been held to warrant a remand for clarification and supplementation."); *McClinton v. Colvin*, No. 13CV8904(CM)(MHD), 2015 WL 6117633, at *23 (S.D.N.Y. Oct. 16, 2015) ("When records produced are illegible but relevant to plaintiff's claim, a remand is warranted to obtain supplementation and clarification."). The record reflects that prior to the alleged onset date, Dr. Dunkelman determined that Plaintiff had a greater limitation for standing and walking than is

reflected in the ALJ's RFC determination.  Although the ALJ may focus his inquiry on the period of disability at issue, these records that pre-date the alleged onset date may still be relevant. *See Petrie v. Astrue*, No. 08-CV-1289 (GLS/VEB), 2009 WL 6084277, at *7 (N.D.N.Y. Nov. 10, 2009) (finding that the ALJ did not have to give controlling weight to evidence that predated the alleged onset date, but that such assessments "may have some relevance."), *report and recommendation adopted*, No. 5:08-CV-1289 GLS/VEB, 2010 WL 1063836 (N.D.N.Y. Mar. 19, 2010), *aff'd*, 412 F. App'x 401 (2d Cir. 2011).  Even if the ALJ had determined that these prior records were not entitled to controlling weight, at the very least these earlier records indicate that there is likely to be crucial information in Dr. Dunkelman's records from after the alleged onset date, which the ALJ failed to consider.  Upon remand, the ALJ should clarify and potentially supplement the record regarding Dr. Dunkelman's impression of Plaintiff's spinal injury and its effect on his ability to work.[3]

## D.  The ALJ's Credibility Assessment

Plaintiff attacks ALJ Gonzalez's RFC determination on three additional grounds: he maintains that the ALJ (1) improperly discounted Plaintiff's subjective pain complaints without considering the correct factors; (2) failed to perform a function-by-function assessment; and (3) improperly concluded that Plaintiff's statements were not credible to the extent that they were inconsistent with the ALJ's RFC determination. (Docket Nos. 12, 16).  For the following reasons, these arguments are unpersuasive.

---

[3] Additionally, the ALJ may only give limited weight to his impression of Plaintiff's apparent pain while sitting during the pendency of the hearing. *See Carroll v. Secretary of Health and Human Servs*, 705 F.2d 638, 643 (2d Cir. 1983) ("ALJ's observation that [the claimant] sat through the hearing without apparent pain, being that of a lay person, is entitled to but limited weight . . . .") (abrogated on other grounds); *Rivera v. Schweiker*, 717 F.2d 719, 724 (2d Cir. 1983) (giving ALJ's observations at the hearing limited weight in evaluating the claimant's credibility).

Regarding Plaintiff's first contention, the regulations set forth the factors that the Commissioner will consider in determining the nature and severity of a claimant's impairment(s).  These factors include:

> (i) [The claimant's] daily activities; (ii) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms; (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of [] pain or other symptoms; (vi) Any measures [the claimant] use[s] or ha[s] used to relieve [] pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).  In determining that Plaintiff had an RFC for sedentary work with the additional seizure and skill limitations, the ALJ noted his consideration of the entire record, and specifically discussed Plaintiff's hearing testimony concerning his daily activities, his symptoms relating to his seizure disorder, spinal injury, and depression, his medications and alleged side-effects, and the treatment that Plaintiff had received, among other factors.  I therefore find that the ALJ properly assessed the relevant factors in determining Plaintiff's limitations, with the exception of neglecting to consider the assessments of Plaintiff's treating physician Dr. Dunkelman, as discussed above.

Next, Plaintiff contends that the ALJ erred by failing to perform a function-by-function analysis.  However, "the Second Circuit has never held that an ALJ must conduct 'a function-by-function analysis, and the Third and Sixth Circuits have specifically ruled that such an analysis is not required." *Cruz v. Astrue*, 941 F. Supp. 2d 483, 498 (S.D.N.Y. 2013) (citations and quotation marks omitted).  Instead, the ALJ "must explain how the evidence supports his or her conclusions about the claimant's limitations and must discuss the claimant's ability to perform sustained work activities." *Casino-Ortiz v. Astrue*, No. 06 Civ. 0155(DAB)(JCF), 2007 WL

2745704, at *13 (S.D.N.Y. Sept. 21, 2007) (citations and quotation marks omitted), *report and recommendation adopted*, No. 06 Civ. 155(DAB)(JCF), 2008 WL 461375 (S.D.N.Y. Feb. 20, 2008).  As I find that the ALJ sufficiently explained how the evidence in the record supports his conclusion regarding Plaintiff's limitations, ALJ Gonzalez's failure to perform a function-by-function analysis is not an appropriate ground for remand or reversal.

Finally, Plaintiff alleges that the ALJ erred by concluding that Plaintiff's statements were not credible to the extent that they were inconsistent with the his RFC determination when the proper inquiry is whether the claimant's statements are inconsistent with the objective medical evidence.  This argument is unpersuasive.  This boilerplate language has certainly received criticism by this Court and others. *See Cruz v. Colvin*, 12 Civ. 7346, 2013 WL 3333040, *15–16 (S.D.N.Y. July 2, 2013) (cases cited therein), *report and recommendation adopted*, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014); *see also Pierce v. Colvin,* 739 F.3d 1046, 1050 (7th Cir. 2014) ("we have often criticized such language as "meaningless boilerplate.")  Nonetheless, "this erroneous boilerplate language does not merit remand if the ALJ offers specific reasons to disbelieve the [claimant's] testimony." *Abdulsalam v. Comm'r of Soc. Sec.*, No. 5:12-CV-1631 MAD, 2014 WL 420465, at *7 (N.D.N.Y. Feb. 4, 2014).  In the instant case, ALJ Gonzalez gave a detailed explanation for his credibility finding that went beyond the divergence between Plaintiff's alleged symptoms and the ALJ's RFC determination.  As such, this ground does not justify a remand or reversal.

## E.  The ALJ's Past Relevant Work Analysis

Finally, Plaintiff claims that the ALJ erred at step four in not fully developing the record regarding the requirements of Plaintiff's past relevant work as a clerk in a doughnut shop.  He

further maintains that the ALJ's determination that Plaintiff was capable of performing his past relevant work is not supported by substantial evidence.

"[I]n order to determine at step four whether a claimant is able to perform her past work, the ALJ must make a specific and substantial inquiry into the relevant physical and mental demands associated with the claimant's past work, and compare these demands to the claimant's residual capabilities." *Kerulo v. Apfel*, No. 98 CIV. 7315 MBM, 1999 WL 813350, at *8 (S.D.N.Y. Oct. 7, 1999) (citing cases). An ALJ's mere assertion as to the requirements of a prior job has been found to be insufficient evidence of the demands of past employment. *Id.* at *9 (finding that the ALJ's statement that the claimant's past relevant work as a letter carrier did not involve high levels of stress was "merely an assertion" and not substantial evidence where there was no testimony nor evidence submitted regarding the demands of the claimant's work). But the Second Circuit has held that a claimant's work history report is sufficient evidence of the requirements of a prior job. *Cichocki v. Astrue*, 534 F. App'x 71, 77 (2d Cir. 2013) (summary order).

In the instant case, Plaintiff indicated in his work history report that he was required to stand for eight hours each day and to sit for thirty minutes in his last job. (R. 264-71). Additionally, at the hearing, Plaintiff testified that the heaviest thing he had to lift was a cup of coffee, and that he had to stand during his entire shift. (R. 57). He reported that he left the job because he "couldn't stand anymore[.]" (R. 57). I find that the work history report, along with Plaintiff's testimony regarding the requirements of the position, constitutes substantial evidence of the requirements of Plaintiff's prior relevant employment. The question remains whether Plaintiff retains the RFC to meet these requirements with his spinal injury. The ALJ must review

the assessment of Dr. Dunkelman to determine whether Plaintiff is capable of performing this past relevant work.

## IV. CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that the Commissioner's motion should be denied and Plaintiff's cross-motion for judgment on the pleadings should be granted in part and denied in part, and the case be remanded for further consideration by the Commissioner.

## V. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Kenneth M. Karas at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Honorable Kenneth M. Karas and not to the undersigned. Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that

will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   February 22, 2016
          White Plains, New York

**RESPECTFULLY SUBMITTED,**

JUDITH C. McCARTHY
United States Magistrate Judge